Max C. GREENLEE, Jr., M.D., Plaintiff,

v.

The BOARD OF MEDICINE OF the DISTRICT OF COLUMBIA, and Warren J. Strudwick, Sr., M.D., Vivian W. Pinn–Wiggins, M.D., William E. Brown, M.D., Richard Guy, M.D., John Lynch, M.D., Reed Tucker, M.D., and Ellen Davis, individually and in their official capacities as members of the Dist. of Columbia Board of Medicine, Defendants.

Civ. A. No. 91–3331 LFO.

United States District Court, District of Columbia.

Feb. 3, 1993.

**50**

Carl V. Angelis, Washington, DC, for plaintiff.

John Payton, Corp. Counsel, DC, Martin L. Grossman, Deputy Corp. Counsel, DC, Civ. Div., Melvin W. Bolden, Jr., Chief, Sp. Litigation Section, Thomas Koger, Asst. Corp. Counsel, DC, Washington, DC, for defendants.

## MEMORANDUM

OBERDORFER, Senior District Judge.

Plaintiff, Max Greenlee, is a doctor with a medical degree from the State University of New York, Downstate ("SUNY"). Between July 1987 and July 1990, plaintiff was denied a license to practice medicine in the District of Columbia by defendants, the District of Columbia Board of Medicine ("Board") and the Board's individual members. He therefore brings this suit under 42 U.S.C. § 1983 seeking damages for lost wages and injury to his professional development.

On cross-motions for summary judgment, the parties agree that no material facts are in dispute. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). The case, therefore, is ripe for a decision on the merits. Because plaintiff has failed to state a cause of action under either the equal protection clause or the due process clause of the Fifth and Fourteenth Amendments, the accompanying order denies plaintiff's motion for partial summary judgment and grants defendants' cross-motion for summary judgment.

### I.

The D.C. Board of Medicine was established by the Health Occupations Revision Act, D.C.Code § 2–3301.1 *et seq.* ("Revision Act"), and operates as an entity within the District of Columbia Department of Consumer and Regulatory Affairs, a department of the executive branch of the Government of the District of Columbia. The Board is responsible for evaluating the qualifications and supervising the examinations of applicants for licensure to practice

medicine in the District. D.C.Code § 2–3304.8.

Under the Revision Act, the Board is allowed to grant licensure on a number of grounds. Where the applicant demonstrates to the Board's satisfaction that she or he is licensed or certified to practice medicine and is in good standing under the laws of another state with requirements which, in the Board's opinion, are substantially similar to those required for licensure in the District, the Board may grant licensure through "endorsement." Alternatively, an applicant may obtain a license by establishing to the Board's satisfaction that she meets the requirements for licensure established in the District, or by passing an examination administered by the Board ("examination"). Finally, the Board may waive the examination requirement if the applicant otherwise is qualified under the D.C. Revision Act and rules. *See* D.C.Code §§ 2–3305.3, 2–3305.4, 2–3305.7, 2–3305.6, 2–3305.8.

On July 22, 1987, plaintiff, a licensed doctor in the State of New York and a diplomate of the National Board Examination, applied for a license to practice medicine in the District of Columbia on the basis of endorsement.

Following an initial review of plaintiff's application, on October 7, 1987, the Board voted preliminarily to deny the license. In October 1987, the Board decided to seek additional information regarding Greenlee's employment history to supplement the application.

On or about February 10, 1988, the Board issued a Notice of Intent to Deny License ("Notice"). The Notice informed plaintiff of the Board's intent to deny his application, stating plaintiff had failed to satisfy the Board that he was professionally qualified to be issued a license based on endorsement. The Charge and Specifications for the intended denial indicated that plaintiff had failed to complete three previous residency programs. The evaluation from plaintiff's most recent year-long residency at the Interfaith Medical Center described plaintiff's performance as satisfactory only, and indicated that plaintiff had

"only an average knowledge of medicine" and had "certain specific deficiencies in that knowledge." Def.Ex. 5.

On May 12, 1988, the Board conducted a hearing on the stated Charge and Specifications, pursuant to D.C.Code § 2–3305.19(a). At the hearing, plaintiff testified on his own behalf, introduced exhibits into evidence, and examined witnesses whom he had subpoenaed. Although plaintiff properly had requested that the Board subpoena two witnesses regarding his previous employment history, neither was present. Based in part on letters and questionnaires gathered by the Board from plaintiff's previous employers, the following evidence was presented at the hearing regarding plaintiff's education and employment history.

Plaintiff commenced his undergraduate studies in 1961 at Howard University, withdrew in 1967, was readmitted in 1969, and graduated in 1972. In 1974, he commenced medical school at the State University of New York, Downstate ("SUNY"), a fully accredited school of medicine. While attending medical school, plaintiff received a grade of honors in one course and a grade of satisfactory in all others. Plaintiff testified that after graduating from medical school, he was "'burnt out' and [he] felt that ... [he] did not have to push as hard from then on." Def.Ex. 4, Transcript of May 12, 1988 Hearing, at 20–21.

Plaintiff commenced his first residency at Howard University Hospital on June 28, 1979. On December 12, 1979, he was terminated from that residency for "failure to report to duty and inability to perform satisfactorily in the Department of Surgery." Def.Ex. 11, Letter from Dr. La Salle D. Leffall dated December 12, 1979. A subsequent letter by Dr. Clive O. Callendar to the Maryland Board of Medical Examiners stated Greenlee "admitted at the time that he had lost interest and the particular motivation necessary for completion of his internship." Def.Ex. 13. At the May 12 hearing, plaintiff testified that his performance during the first five months of the residency was entirely satisfactory, and the problems that arose were limited to plain-

tiff's absence from work during the early part of December 1979. Def.Ex. at 34.

Further information was presented at the hearing concerning plaintiff's second unsuccessfully attempted residency at the Tripler Army Medical Center, Honolulu, Hawaii. Plaintiff commenced that residency in August 1980 and resigned on the advice of his superiors in March 1981. In an August 27, 1987 letter to the Board, Dr. Peter J. Garcia explained that

Dr. Greenlee was a motivated, honest, conscientious doctor who tried hard but who was limited by an insufficient data base, difficulty synthesizing information and, perhaps, a lack of organization. We felt that the approximately two years he was out of medicine after medical school placed him at a severe disadvantage. He had difficulty from the beginning, and we tried to help bring his work up to acceptable levels, but without consistent success. Max resigned from the internship under honorable conditions in March (on our advice), and was discharged from the Army. While I believe he profited from his time at Tripler, we can give him no credit for academic purposes.

Def.Ex. 17. Plaintiff conceded that once again he had been "burned out" when he was asked to resign. He testified, however, that his resignation resulted from his refusal to testify, against the Army's request, in a matter of alleged child abuse. Def.Ex. 4 at 9.

Plaintiff's third unsuccessful residency lasted approximately two weeks, between July 1 and July 16, 1982, at St. Agnes Hospital, Baltimore, Maryland. Plaintiff's performance in this residency was not evaluated, due to its brevity. Plaintiff, however, testified that he "was not equipped, at [that] time, to deal" with the "many other things which go on in a hospital, which have nothing to do with medicine." Def. Ex. 4 at 53–55.

Plaintiff received his license to practice medicine in the State of New York on June 3, 1985. He began his final residency in internal medicine at Interfaith Medical Center on July 1, 1986, four years after he left St. Agnes. Interfaith's residency is a post-graduate clinical training program accredited by the Accreditation Council for Graduate Medical Education.

In a letter to the Board dated January 5, 1988, regarding Greenlee's performance at Interfaith, Dr. Edward A. Geis, Associate Director of Internal Medicine at Interfaith, wrote that the faculty

considered [Greenlee's] overall performance to range from low satisfactory to high satisfactory. In certain clinical areas and with certain tasks, his work was felt to be somewhat slow. His medical knowledge is average, but with certain specific deficiencies especially in Intensive Cardiology. His work habits, responsibility, and interpersonal skills are good to very good.

Def.Ex. 20. Dr. Paul Montner, Chief of Critical Care, and Dr. Gerald M. Greenberg, Chief of Pulmonary Medicine at Interfaith, both wrote the Board in support of plaintiff's licensure application. Greenberg characterized plaintiff as a dedicated, conscientious physician, who related well to patients, families, and co-workers, and who demonstrated the highest level of personal integrity and ethical standards. Plaintiff's Request for Admissions 1.d. Interfaith offered Greenlee a second year medical residency. Greenlee declined the offer for further post-graduate medical training in order to commence practice.

Plaintiff concluded his residency at Interfaith on June 30, 1987. On July 1, 1987, plaintiff was declared a diplomate of. the National Board of Medical Examiners, having fulfilled the requirements for certification, including successful completion of a year of post-graduate clinical practice.

Greenlee immediately relocated to the District of Columbia. On July 22, 1987, he submitted his application for a license to practice medicine in the District on the basis of endorsement. Plaintiff accepted a job as a cab driver pending the Board's granting of his medical license, as he had done throughout medical school and during all previous breaks in his medical education and practice.

At the hearing, plaintiff requested that the panel identify his current deficiencies

for licensing, if any, so that he might be able to remedy such deficiencies through an examination or course of study. Pl. Request 1.q. Although two members of the panel suggested that plaintiff take next available Federal Licensing Examination ("FLEX") to demonstrate his basic medical knowledge, that offer was not pursued by the full Board.

Following the hearing, the Office of the Corporation Counsel of the District of Columbia filed Proposed Findings of Fact, Conclusions of Law, and Order for the Board on June 13, 1988. Def.Ex. 22. The Proposed Order concluded that plaintiff had failed to satisfy the Board that he was professionally qualified to be issued a license to practice medicine and surgery in the District of Columbia on the basis of endorsement, and recommended that his application be denied.

Plaintiff likewise submitted Proposed Findings of Fact, Conclusions of Law, and Order to the Board on July 7, 1988. Def. Ex. 21. In this proposed decision, plaintiff argued the Board should waive the examination requirement on the basis of a rule pending adoption by the Mayor, which was to take effect on August 5, 1988.

On July 13, 1988, the Board issued its own Proposed Findings of Facts, Conclusions of Law, and Order, following the reasoning of the Corporation Counsel. On August 29, 1988, plaintiff responded by filing his Exceptions and Written Argument in Support Thereof to Proposed Decision of Hearing Panel.

On December 14, 1988, the Board issued its Final Order, together with Findings of Fact and Conclusions of Law (together, "Final Decision"), denying plaintiff's license application. The Board based its denial of plaintiffs' application for licensure by endorsement on the fact that the requirements for licensure in New York were not "substantially equivalent" to those in the District of Columbia, as required by the statute. In particular, New York had not required satisfactory completion of a year-long residency, nor had plaintiff completed such a residency at the time he was li-

censed by New York in June 1985. Def. Ex. 21, at 2, 5.

The Board also concluded, based on plaintiff's erratic education and employment history, that plaintiff had failed to establish to the Board's satisfaction that he possessed the appropriate skills, knowledge, judgment, and character to practice medicine as required by a rule promulgated by the Mayor on August 5, 1988. D.C.Code § 2–3305.3(a)(5); D.C.M.R. § 4600.4 Def.Ex. 21 at 6–9, 11. Factual findings accompanying the Final Order stated as follows:

> Plaintiff had repeatedly absented himself from the practice of medicine by seeking and working at jobs wholly unrelated to medical practice between medical school and his first residency, between residencies, and immediately upon completing his interfaith residency, rather than engaging in some practice of medicine during those periods ... and that plaintiff complained of being "burnt out," "very tired" and "unable to deal."

Based on these findings, the Board concluded that

> Dr. Greenlee does not have the qualifications to practice medicine in the District of Columbia. His record demonstrates that he is unable to sustain a competent level of performance in the practice of medicine. Although he graduated from medical school in 1978, he was unable to complete one year of post-graduate clinical education until 1987. He failed three residencies. In between residency attempts, he drove a cab rather than pursue employment that would advance his knowledge and skills. Finally, after completing one year of residency training, he again found that the pressure was too great for him. Rather than continuing his training for a second year, he once again turned to driving a taxicab.
>
> The practice of medicine is a stressful occupation; residency training, in particular, is a test of a doctor's ability to perform under stress. Respondent's repeated failure and chronic under-achievement as a resident demonstrate to the Board that Respondent is unable to prac-

tice consistently at an acceptable level of competence. The one year of "satisfactory" training marked by certain deficiencies does not, on balance, persuade the Board that the Respondent has the necessary skills, knowledge, and judgment to practice medicine when weighed against his earlier failures.

Def.Ex. 2 at 7.

Rather than requiring plaintiff to complete the FLEX examination, as had been suggested by two physicians at the May 12 hearing, the Final Order required plaintiff to successfully complete two additional consecutive years of post-graduate clinical training, or the equivalent, before his application would be reconsidered.

On January 23, 1989, plaintiff filed a Petition for Review before the District of Columbia Court of Appeals. On March 13, 1990, however, the Board moved to have the case remanded to allow the Board to reverse itself and issue plaintiff a license.[1]

By an order dated July 2, 1990, the Board vacated its order of December 14, 1988, and granted plaintiff a license to practice medicine in the District of Columbia. Def.Ex. BB. Plaintiff subsequently requested that the Board retract any matters adverse to plaintiff's professional standing that had been communicated to the States Federation of State Medical Boards ("the Federation") or other entities during the Board's investigation of plaintiff. The Board refused to comply with Greenlee's request, agreeing only to inform the Federation of its decision to grant his license.

Plaintiff now sues defendants in both their individual and official capacities for damages and injunctive relief. In his complaint, plaintiff alleges that by denying him a license for the nearly three years between August 1987 and July 1990, defendants exceeded their statutory discretion and acted arbitrarily and capriciously and without factual basis, in violation of plain-

tiff's due process rights and the equal protection clause. Plaintiff demands compensatory and punitive damages for the nearly three years of lost income and obstruction to his professional development. He seeks additional damages for the Board's continuing refusal to retract its finding that he was unqualified for licensure, and for severe mental anguish. Plaintiff finally prays for injunctive relief requiring the Board to retract all matters previously disseminated that are adverse to plaintiff's professional reputation.

Defendants oppose and move for summary judgment on the grounds that plaintiff has failed to state a claim under either the equal protection or due process clause pursuant to § 1983. Alternatively, defendants argue that even if plaintiff's substantive rights were violated, defendants enjoy qualified immunity, the Board is *non sui juris*, and punitive damages are not available.

## II.

As a threshold question, the parties agree that the Complaint should be dismissed as against defendant Reed Tuckson, M.D. Although a member of the licensing Board, Tuckson was not present at any meetings and did not participate in the decision to deny plaintiff a license. Accordingly, because Reed did not deprive plaintiff of any rights as required by § 1983, plaintiff's claims against defendant Reed shall be dismissed.

## III.

Turning to the merits, section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

---

**1.** Six of the eight Board members have stated in deposition that the Board's decision to reverse itself was taken pursuant to an implied order by the D.C. Court of Appeals. Deposition of John Lynch, M.D. at 62; Deposition of Vivian Pinn, M.D. at 15; Deposition of Richard Guy, M.D. at 6, 35; Deposition of Ellen Davis at 28–30; Deposition of Warren J. Strudwick, M.D. at 2, 9, 29–31; Deposition of William E. Brown, M.D. at 47–48.

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Plaintiff alleges that defendants' denial of his medical practitioner's license violated due process and the equal protection of the laws and therefore is actionable under § 1983. Because plaintiff has failed to demonstrate either that his due process or his equal protection rights have been violated, however, plaintiff has failed to state a claim upon which relief may be granted.

(A) The Equal Protection Claim

■■■ Judicial review of claims under the equal protection clause is limited to a rational basis test unless the plaintiff demonstrates the state's alleged detrimental conduct either (a) impaired a fundamental constitutional right or (b) was based on plaintiff's membership in a suspect classification. *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *Roberts v. District of Columbia Bd. of Medicine,* 577 A.2d 319, 327 (D.C.App.1990). Plaintiff does not allege he is a member of a suspect class. Nor does denial of a license to practice medicine, or any other professional occupation, implicate a fundamental constitutional right. *Dent v. West Virginia,* 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889); *Madarang v. Bermudes,* 889 F.2d 251 (9th Cir.1989); *Thomas v. Board of Examiners, Chicago Public Schools,* 651 F.Supp. 664 (N.D.Ill.1986), *aff'd* 866 F.2d 225 (7th Cir.1988). Accordingly, defendants' denial of plaintiff's license does not violate the equal protection clause so long as that decision was rationally related to a legitimate state purpose.

■■ Courts long have recognized that state licensure of health care professionals advances a significant and wholly legitimate public interest. *See e.g. Dent v. West Virginia,* 129 U.S. at 122, 9 S.Ct. at 233; *Mannan v. District of Columbia Bd. of Medicine,* 558 A.2d 329, 334 (D.C.App. 1989); *Sherman v. Commission on Licensure to Practice Healing Art,* 407 A.2d 595, 601 (D.C.App.1979). The only question to be examined, therefore, is whether the Board's decision was rationally related to this legitimate state purpose.

The record demonstrates that plaintiff's application met the express statutory requirements for licensure. His employment record, however, notably his three failed residencies and the extended interim between medical school and his completion of the Interfaith residency, justified the Board's concern regarding plaintiff's medical preparedness and his ability to handle the stress inherent in medical practice. In light of the evidence, the Board's decision not to grant plaintiff's license absent additional post-graduate clinical experience cannot be considered irrational. The fact that the Board subsequently reversed itself and granted plaintiff's license in July 1990 also does not detract from the rationality of the initial denial.[2] Thus, because the Board's denial was rationally related to the legitimate state interest in promoting public health, plaintiff's equal protection claim fails. Defendants are entitled to summary judgment on this claim.

(B) The Due Process Claim

In addition to his equal protection claim, plaintiff alleges that defendant's decision to deny his application exceeded the Board's statutory discretion and was unsupported by the record, thereby violating due process.

---

**2.** Plaintiff argues that by vacating its December 14, 1988 order and granting plaintiff's license, the Board now is collaterally estopped from defending the earlier denial. Plaintiff's Response to Defendant's November 6, 1992 Post–Argument Submission. The Board's action, however, did not constitute an admission that its previous denial either violated plaintiff's constitutional rights or was otherwise improper. As discussed below, the Board enjoys some discretion in determining the fitness of candidates for licensure, and its actions, both in denying and subsequently in granting the license, fall within the scope of this discretion.

The due process clause of the Fourteenth Amendment prohibits states from depriving any individual of life, liberty, or property without due process of law. In order to prevail on his due process claim, therefore, plaintiff first must demonstrate that a violation of some "liberty" or "property" interest has occurred. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Although the distinction between liberty and property interests is murky at times, the Supreme Court has restricted constitutional property interests to those in which an individual enjoys an *entitlement.* Thus,

[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* at 577, 92 S.Ct. at 2709.

■■ Plaintiff's claim does not clearly implicate a property interest. It is true that possession of a professional license or public employment generally constitutes "property" protected by the Fourteenth Amendment. *Perry v. Sidermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). But courts generally have held that present enjoyment is integral to the existence of a property entitlement. The *potential* for licensure or employment thus ordinarily does not give rise to a property interest. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Board of Regents v. Roth,* 408 U.S. at 576, 92 S.Ct. at 2708.

Defendants argue that because plaintiff's claim does not implicate a protected property interest, plaintiff's due process claim necessarily fails. Plaintiff's claim cannot be dismissed so readily, however, for "[t]here is indeed a concept of liberty of occupation." *Thomas v. Bd. of Examiners,* 651 F.Supp. at 668, *quoting, Bigby v.*

*City of Chicago,* 766 F.2d 1053, 1057 (7th Cir.1985). It is well established that

[T]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure.

*Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915).

Specifically, the Supreme Court has determined that although a state may require "high standards" for professional qualifications, "[a] State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause." *Schware v. Board of Bar Examiners,* 353 U.S. at 238, 77 S.Ct. at 756. In *Schware,* the Supreme Court overturned the State of New Mexico's denial of petitioner's application to take the State bar exam as violative of due process. Writing for the majority, Justice Black established that

any qualification must have a rational connection with the applicant's fitness or capacity to practice law ... Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory.

*Schware,* 353 U.S. at 238–39, 77 S.Ct. at 756, *citing Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Justice Black found that the State's reliance on Schware's previous arrests, aliases, and membership in the Communist Party to conclude that he was morally unfit to practice law could not rationally be justified by the evidence. *Id.* 353 U.S. at 246–47, 77 S.Ct. at 760–61.

The *Schware* Court did not address the question of whether admission to the bar constituted a property or liberty interest protected by the Fourteenth Amendment. The Court instead stated, "[I]t is sufficient to say that a person cannot be prevented from practicing except for valid reasons. Certainly the practice of law is not a mat-

ter of the State's grace." 353 U.S. at 239 n. 5, 77 S.Ct. at 756 n. 5.

■ Since *Schware*, however, courts have confirmed that "ineligibility for employment in a major sector of the economy" implicates a fundamental liberty interest. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976). Even *Board of Regents v. Roth*, while rejecting the premise that denial of employment by a single institution implicated constitutional liberty interests, acknowledged that "regulations to bar the respondent from all other public employment in state universities ... would be a different case." 408 U.S. at 573–74, 92 S.Ct. at 2707. *See also Cafeteria and Restaurant Workers Union v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). As indicated above, denial of any particular employment position does not entitle an individual to Fourteenth Amendment scrutiny. But whether the deprivation occurs in the legal profession, *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); *Schware*, 353 U.S. 232, 77 S.Ct. 752, the tax and public accounting professions, *Goldsmith v. United States Board of Tax Appeals*, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926), or in education, *Thomas v. Bd. of Examiners*, 651 F.Supp. at 668, access to an entire profession is a liberty interest that cannot be denied without due process of law.[3]

■ Having established that plaintiff suffered a deprivation of liberty triggering due process protections, "the question remains what process is due." *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985). The due process clause, of course, encompasses both procedural and substantive protections. On the procedural prong, individuals at a minimum must be provided notice and an opportunity to rebut evidence before being deprived of a signifi-

cant liberty or entitlement. *Loudermill*, 470 U.S. at 542, 105 S.Ct. at 1493. Depending on the nature of the interest, a pretermination hearing may also be required. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

### 1. *Procedural Due Process*

■ Previous challenges to denials of rights to practice a certain occupation have turned primarily on the absence of adequate procedures. In *Willner v. Committee on Character & Fitness*, for example, the Court struck down a state committee's denial of a certificate to practice law where the plaintiff had no opportunity to confront and cross-examine the witnesses whose character testimony led to his denial. The Court found that in such situations, the opportunity for confrontation is a necessary element of due process. 373 U.S. at 104, 83 S.Ct. at 1180. *See also Thomas v. Board of Examiners*, 651 F.Supp. 664.

The present case raises no question that the procedures afforded plaintiff were adequate. The record clearly demonstrates that plaintiff was afforded all procedures provided for under the applicable statutes, the Revision Act, D.C.Code § 2–3301.1 *et seq.*, the District of Columbia Administrative Procedure Act, D.C.Code § 1–1501 *et seq.* ("DCAPA"), and the applicable rules thereunder, all of which fully comport with due process.

After applying for his medical license by endorsement, plaintiff received timely notice of the Board's intent to deny his license, the Charge and Specifications for the denial, and his right to a hearing. D.C.Code §§ 1–1509, 2–3305.19(c) and 17 D.C.M.R. 4102.3. Plaintiff was afforded a hearing on May 12, 1988, where he testified on his behalf, introduced exhibits into evidence, and examined witnesses. Although two witnesses whom plaintiff had requested be subpoenaed were not available, plaintiff does not challenge the adequacy of the process on this grounds. Plaintiff was not

---

**3.** In the present case, plaintiff's liberty interest in the medical license also approaches that of a property entitlement, since the Board has no discretion to grant or deny licenses once it determines that the statutory and regulatory re-

quirements have been met. *See Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709; *Fitzgerald v. Hampton*, 467 F.2d 755, 760–61 (D.C.Cir.1972).

**58**

denied an opportunity to be represented by counsel.

Following the hearing, plaintiff submitted Proposed Findings of Fact, Conclusions of Law, and Order. The Board in turn issued its own Proposed Findings of Fact, Conclusions of Law, and Order, to which plaintiff filed his Exceptions and Written Argument. On December 14, 1988, the Board issued its Findings of Fact, Conclusions of Law, and Order ("Final Decision") denying plaintiff's application. The Final Decision was accompanied by a statement of the applicable facts and legal conclusions.

Having been afforded notice with reasons, a full hearing with the opportunity to confront witnesses and rebut evidence, further opportunity to submit findings, and an opportunity for judicial review, plaintiff benefitted from the full panoply of procedural rights the Constitution conceivably would require. Plaintiff does not dispute this view.

### 2. *Substantive Due Process*

■ Plaintiff instead appears to raise a substantive due process challenge to the Board's decision. Plaintiff argues the Board's conclusion was unsupported by the evidence, particularly in light of the Board's later retraction, and that the Board's reliance on information regarding Greenlee's employment history was not authorized by the statute.

The evidence does not support the claim, however, that plaintiff's substantive due process rights under the statute and rules were violated. Substantive due process requires that the criteria relied upon by the Board "must have a rational connection with the applicant's fitness or capacity" to practice the occupation. *Schware*, 353 U.S. at 239, 77 S.Ct. at 756. As discussed above, the Board's decision to deny Greenlee's license was reasonable in light of the record. The criteria on which defendants relied—plaintiff's erratic educational and employment history—clearly are rationally related to plaintiff's fitness to practice medicine. Undeniably, the record also might have supported the opposite conclu-

sion. Regardless of whether this Court agrees with the Board's conclusion, though, the Board's denial was neither irrational nor unsupported by the evidence.

### IV.

Plaintiff's primary "due process" claim, however, is that the Board's action was based on criteria not required by the D.C. statute, exceeded the Board's discretion, and thus was *ultra vires*. Although presented as a substantive due process argument, this issue actually raises a pendent state claim regarding the scope of the Board's authority under local law. Because of the weighty federal issues involved, and because both the federal and state law claims "derive from a common nucleus of operative fact," *United Mineworkers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), this Court is willing to reach the merits of the state claim.

■ As a statutory creation, the Board of Medicine cannot exceed the powers given it by statute. *Davidson v. District of Columbia Board of Medicine*, 562 A.2d 109, 112 (D.C.App.1989). Plaintiff applied for licensure by endorsement only. Under D.C.Code § 2–3305.7, the Board may, in the exercise of its discretion, issue a license by endorsement to an applicant who is

> licensed or certified and in good standing under the laws of another state with requirements which, in the opinion of the board, were substantially similar at the time of licensure to the requirements of this chapter.

■ The Revision Act requires that applicants for medical licensure by the District of Columbia have completed "at least 1 year of residency in a hospital or other health-care facility licensed by the District or by any state." §§ 2–3305.3, 2–3305.4. Although plaintiff held a license from the State of New York, New York does not require completion of a year-long residency for licensure, and plaintiff had not completed his residency in 1985 when he received the New York license. The Board determined that plaintiff's New York licensure

was not based on requirements "substantially equivalent" to those of the District, and accordingly denied the application. Because the Board enjoys discretion in granting licensure by endorsement, defendants did not improperly deny the license on this grounds.

Plaintiff appears to argue, however, that the Board should have considered other options for licensure aside from the endorsement option indicated on plaintiff's application. As noted above, the Revision Act allows an applicant to obtain a license on three bases other than endorsement: (1) by satisfying the Board she meets the requirements for licensure in D.C.; (2) by passing the Board's examination; or (3) through waiver of the examination if the applicant satisfies the Board that she is otherwise qualified to practice.

For licensure other than through reciprocity or endorsement, D.C.Code §§ 2–3305.3 and 2–3305.4 establish the statutory requirements in the District of Columbia. Section 2–3305.3 requires that

"[a]n individual applying for a license under this chapter shall establish to the satisfaction of the board regulating the health occupation that the individual ..."

(1) has not been convicted of an offense which bears directly on the fitness of the applicant, § 2–3305.3(a)(1);

(2) is at least 18 years of age, § 2–3305.3(a)(2); and

(3) has passed an examination administered by the Board or recognized by the Mayor to practice the health occupations, D.C.Code § 2–3305.3(a)(4).

Section 2–3305.4, governing the Board of Medicine, likewise requires that

"[a]n individual applying for a license to practice medicine under this chapter shall establish to the satisfaction of the Board of Medicine that the individual ..."

(1) is a graduate of an accredited school of medicine, D.C.Code § 2–3305.4(e); and

(2) has completed at least one year of residency in a licensed hospital or other health care facility, D.C.Code § 2–3305.4(e).

The section closes by mandating that "[e]ach board shall [a]dminister and enforce the provisions of this chapter, and rules and regulations issued pursuant to this chapter," § 2–3304.8(1), and "[e]ach board shall issue licenses to qualified applicants." § 2–3304.8(4). Plaintiff relies on the mandatory language, "shall," in these provisions to argue that, although §§ 2–3305.3 and 2–3305.4 give the Board discretion in determining whether the applicant has met these explicit qualifications, nothing in the statute authorizes the Board to look beyond those criteria.[4]

 Defendants do not dispute that at the time of his application, plaintiff satisfied the requirements detailed in §§ 2–3305.3 and 2–3305.4. Plaintiff had not been convicted, was over 18 years of age, and had passed the National Board Examination. He was a graduate of an accredited medical school and had completed a one-year residency. Plaintiff argues these are the only criteria appropriate for the Board's consideration and that he therefore should have been granted a license.[5]

---

**4.** Plaintiff additionally relies on the Texas State Supreme Court decision in *Bloom v. Texas State Bd. of Examiners of Psychologists*, 492 S.W.2d 460, 462 (Tex.1973), for the proposition that a Board's discretion in administering a statute's stated standards "does not empower the Board to make standards which are different from or inconsistent with the statute."

**5.** Plaintiff points to another section of the D.C.Code to support his belief that he was entitled to a license. Section 2–3305.6(e) provides that the Board may, in its discretion, waive the examination requirements for licensure under the following conditions:

(1) For any applicant who otherwise qualifies for licensure and who is currently licensed or certified under the laws of a state or territory of the United States with standards which, in the opinion of the board, were substantially equivalent at the date of the licensure or certification to the requirements of this chapter; or

(2) For any person who has been certified by a national examining board if the Mayor determines by rule that the examination was as effective for the testing of professional competence as that required in the District. D.C.Code § 2–3305.6(e). A rule promulgated by the Mayor, 17 D.C.M.R. § 4610.1, requires that the Board "shall waive the requirement of

Defendants respond that plaintiff properly was denied licensure by endorsement and that the Board exercised proper discretion in its application of the other statutory criteria. As the basis for this discretion, defendants point to a rule promulgated by the Mayor on August 5, 1988, after plaintiff's hearing had been conducted and the Board's proposed Findings of Fact and Conclusions had been drafted. District of Columbia Code § 2–3305.3(a)(5), which follows §§ 2–3304.3 and 2–3304.4, requires that, in addition to the criteria examined above, each applicant must demonstrate to the Board's satisfaction that she

> [m]eets any other requirements established by the Mayor by rule to assure that the applicant has had the proper training, experience and qualifications to practice the health occupation.

Pursuant to this provision, on August 5, 1988, rules promulgated by the Director of DCRA pursuant to D.C.Code § 2–3303.2(14) and Mayor's Order No. 86–110 were published in the District of Columbia Register and took effect. 35 D.C.R. 5999. These rules included Rule 4600.4, which states as follows:

> An applicant shall establish to the Board's satisfaction that the applicant possesses the appropriate skills, knowledge, judgment, and character to practice medicine.

The presence of Rule 4600.4, in addition to the D.C.Code's requirements, effectively refutes plaintiff's argument he was qualified *per se* under the criteria in §§ 2–3305.3 and 2–3305.4. Those provisions themselves allow the Board some discretion. Rule 4600.4, however, is decisive. That provision clearly provides the Board shall exercise its professional discretion, in addition to examining the criteria in the D.C.Code, to determine whether an applicant "possesses the appropriate skills, knowledge, judgment, and character to practice medicine." Here, the Board determined plaintiff did not.

§ 4605.1 [requiring passage of the FLEX exam] for an applicant who is a diplomate of the National Board of Medical Examiners." Because the explicit language of § 2–3305.6(e)

Judicial deference to the Board of Medicine's interpretation of the Revision Act and rules is appropriate in matters of licensing, which demand "expertise and informed discretion." *Joseph v. District of Columbia Bd. of Medicine,* 587 A.2d 1085, 1088 (D.C.App.1991). Thus, the Board's interpretation is to be considered binding unless it conflicts with the plain meaning of the statute or its legislative history. *Lee v. District of Columbia Dept. of Employment Services,* 509 A.2d 100, 102 (D.C.App. 1986); *Joseph v. Board of Medicine,* 587 A.2d at 1088, *citing Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 n. 11, 104 S.Ct. 2778 n. 11, 81 L.Ed.2d 694 (1984). Deference also is appropriate unless the Board's interpretation is irrational or arbitrary and capricious. Here, the Board's interpretation of the statute was reasonable and its application rationally supported by the evidence. The Board's action accordingly was consistent with D.C. law and must stand.

The final and related consideration is whether the Board's reliance on a rule promulgated nearly one year after plaintiff filed his application and nearly three months after plaintiff's hearing violates plaintiff's due process rights. Rule 4600.4 had not been promulgated at the time of plaintiff's hearing. Nevertheless, as was conceded in open court at the Summary Judgement Hearing on November 2, 1992, plaintiff had notice of the pending rule and full opportunity to address its requirements in his post-hearing submissions to the Board. Both his Proposed Findings of Fact, Conclusions of Law, and Order, and his Exceptions and Written Argument in Support Thereof to Proposed Decision of Hearing Panel, in fact, asserted plaintiff's right to a waiver of the examination requirement based on a related rule also promulgated on August 5, 1988. No due process violation therefore occurred.

makes waiver of the examination requirement entirely discretionary, however, plaintiff cannot rely on this provision.

### V.

Plaintiff has demonstrated neither a violation of equal protection nor a denial of his Fifth and Fourteenth Amendment due process rights. He therefore has failed to state a federal claim under which relief may be granted pursuant to 42 U.S.C. § 1983. Plaintiff's pendent state claim similarly fails, as the Board's action was neither irrational nor *ultra vires*. It therefore is unnecessary to address the parties' additional claims and defenses including, *inter alia,* the Board's immunity and plaintiff's punitive damages claims. Defendant's motion for summary judgment is granted, and the Complaint is dismissed.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 29th day of January, 1993, hereby

ORDERED: that defendants' Motion for Summary Judgment should be, and is hereby, GRANTED; and it is further

ORDERED: that plaintiff's Motion for Partial Summary Judgment should be, and is hereby, DENIED; and it is further

ORDERED: that the Complaint is hereby DISMISSED.